### ONEIDA NAV. CO. v. ARKELL & DOUGLAS, Inc.

(District Court, S. D. New York. August 30, 1921.)

1. Shipping ⨺35—Agents without power to change terms of charter without specific authority.

The master of a vessel and the agent of the charterer are without power to change the terms of a charter party made between the owner and charterer without specific authority.

2. Shipping ⨺35—New charter made by agents held not to displace original charter.

Owner and charterer signed a charter party for a voyage from African to American ports, the vessel to be loaded only by charterer. On arrival

⨺For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

at an African port, the master and charterer's agent there, without knowledge that a charter had been previously signed and through a misunderstanding, signed a new charter at a higher price, but permitting loading by a subcharterer. The vessel was loaded by a subcharterer, but without greater delay or inconvenience to owner. *Held*, that the voyage was made under the original charter and that the owner could not recover the additional charter hire, stipulated for in the second charter party.

In Admiralty. Suit by the Oneida Navigation Company against Arkell & Douglas, Inc. Decree for respondent.

Harrington, Bigham & Englar, of New York City (T. Catesby Jones, of New York City, of counsel), for libelant.

Steckler & Weitzner, of New York City (David Steckler and Emil Weitzner, both of New York City, of counsel), for respondent.

MAYER, District Judge. Libelant sues to recover $5,000, an alleged balance due for freight moneys from the charterer of a schooner owned by libelant. The situation is an odd one, due to a curious misunderstanding. Libelant was the owner of the schooner Percy R. Pyne, II. Respondent corporation is engaged in the export and commission business, with its principal office in New York City and branch offices throughout the world, one of which is at Port Elizabeth, South Africa, and at the times here concerned was in charge of one Wessinger. For brevity, these two offices, will be called New York and Port Elizabeth. In October, 1916, respondent chartered the schooner for her outward bound voyage from New York to three ports in South Africa. The vessel with a full cargo left New York in April, 1917, and arrived at Port Elizabeth on June 15, 1917. While she was on her outward voyage, the parties negotiated for a charter for her homeward voyage. On April 28, 1917, respondent at New York cabled Port Elizabeth, "Telegraph best offer you can make, Percy Pyne return voyage." Port Elizabeth answered in a cablegram, received May 11, 1917, by respondent in New York, offering £8,000 for the return voyage, and setting forth certain details, among which was the requirement that loading should be at Port Elizabeth and East London. To this cablegram New York did not send any reply to Port Elizabeth. Under date of May 22, 1917, Maritime Transportation Company, agent for the Pyne's owner, wrote a letter to respondent in New York, offering the vessel at $40,000 for the homeward voyage. "The owners," stated the letter, "will agree to load at two ports South Africa to either New York or Boston at the charterer's option."

It will thus be seen that, as affecting the charter hire of $40,000, it was a matter of indifference to the owner as to which two ports were selected by the charterer, and as to which of the two ports of destination the charterer would prefer at charterer's option. Nothing was stated in the letter prohibiting the loading of cargo "otherwise than from" the charterer or "their agent." In other words, so far as concerned the amount of the charter money, the owner was entirely willing to let the charterer select any two ports in South Africa and either of two ports of destination in the United States, and also to let the vessel carry charterer's goods or the goods of any one else. On May 26, New York cabled Port Elizabeth:

"Pyne forty-five thousand prepaid, charterers paying loading, discharging, port charges, 20 loading days 10 discharging 2 ports loading New York or Boston discharge, useless for you to cable much change of our terms."

This cablegram, except as to the $45,000, was substantially the same in reciting terms from the home office to Port Elizabeth as was the letter of May 22, 1917, from owner's agent to respondent. What New York intended to convey to Port Elizabeth were instructions as to terms upon which Port Elizabeth could assign or subcharter. On the other hand, as a cable of May 31, 1917, and all the circumstances demonstrate, Port Elizabeth construed New York's cable as stating the amount for which New York had chartered the schooner from its owner.

Under date of May 31, 1917, a charter party was executed and duly delivered as between libelant, per its agent, and respondent, providing, inter alia, for (1) East London and Port Elizabeth as ports of loading; (2) New York or Boston, at respondent's option, as port of discharge; (3) $40,000 as the price; (4) in the printed part of the charter party "no goods or merchandise shall be laden on board otherwise than from" the charterer "or their agent." On June 1, 1917, New York cabled Port Elizabeth:

"Pyne closed, have secured terms as per your telegram No. 172," meaning cablegram which read, "Richardson & Co. * * * will pay $47,250, including our commission $2,250 terms and conditions as per your telegram No. 109 loading ports East London, this port (Port Elizabeth)."

Telegram No. 109 was the one from New York to Port Elizabeth, dated May 26, 1917 referred to supra. As above stated, the vessel arrived at Port Elizabeth on June 15, 1917. Wessinger supposed that the parties in New York had agreed on a charter for $45,000. All that the master knew was that he had received a cable "that the vessel had been chartered, all port charges to be paid by charterer," but the amount had not been cabled. Neither the master, Capt. Dehuhr, nor Wessinger, knew that a charter party had been signed in New York. A statement of the master was received in evidence by consent. It is, in part, as follows:

"I am master of the schooner Percy Pyne, II, and took her from New York with a cargo to Cape Town, Port Elizabeth, and Port Natal, South Africa. When we reached Port Elizabeth I had a talk with the agent of Arkell & Douglas, Mr. Wessinger. I had no instructions from my owners at that time. Mr. Wessinger told me that the vessel was chartered, and asked me to sign a charter party. I told him that I had no instructions from the owners, and could not sign a charter party unless I heard something from home. He showed me a cablegram from Arkell & Douglas in New York to the Port Elizabeth office to the effect that the vessel had been chartered for $45,000 net, charterer to pay port charges and loading and discharging cargo. Mr. Green had cabled me that the vessel had been chartered, all port charges to be paid by charterer, but had not cabled me the amount. That was my reason for asking to see something to show the amount of the charter. Upon Mr. Wessinger's request, therefore, I signed the charter party of July 23, 1917. This was written out in the Port Elizabeth office of Arkell & Douglas. * * * Between our first talk and the signing of the charter party I had gone from Port Elizabeth to Port Natal and returned, and was told that L. Richardson & Co. was the charterer, and I knew that there was a profit of $5,000 on the charter to Arkell & Douglas. Inasmuch as there was no commission except by Richardson, I was not in-

terested on behalf of the ship. I did not know anything about any other charter party for the same trip having been signed until I reached New York. * * * When I came to settle my accounts with Arkell & Douglas in Port Elizabeth, Mr. Wessinger wanted me to settle on the basis of $40,000 for the home charter, which I refused to do. Mr. McNaught was in charge during Mr. Wessinger's absence and it was with him I had my conversation. He told me that since he signed the charter they had received a letter from New York stating that the amount of the charter was $40,000, but for me not to say anything to Richardson about it. He asked how I would settle the controversy, and I said only on the basis of the charter party which I had signed, $45,000. * * * "

The charter party of July 23, 1917, thus signed at Port Elizabeth, provided (1) two South African ports as loading ports, instead of specifically naming East London and Port Elizabeth; (2) Boston only as port of discharge; and (3) there was no clause, such as in the first charter, as to "no goods * * * shall be laden otherwise than from" the charterer. There were also some minor differences. The charter was assigned by respondent to L. Richardson & Co. The schooner, on her outward voyage, discharged her cargo at Cape Town, Port Elizabeth, and Port Natal, discharging the last of her cargo at Port Natal. She then went into dry dock at Port Natal for repairs for a few days. After leaving dry dock, she loaded 212 bales of wool at Port Natal for L. Richardson & Co. and then went to Port Elizabeth, where she took the rest of her cargo, proceeding thence to Boston.

From the master's statement, it is apparent that the charter party was not signed until the schooner returned to Port Elizabeth from Port Natal, and in any event, because she discharged and dry-docked at Port Natal, it is plain that she did not make any extra trip, nor was she inconvenienced, by taking on the Richardson cargo at Port Natal. Indeed, she was better off that the two ports were Port Natal and Port Elizabeth, rather than East London and Port Elizabeth, because, for discharging purposes, she evidently had to go to Port Natal in any event. Her port of destination in the second charter party was one of the two mentioned in the first, and the elimination of choice was against the charterer. Whether the cargo was Richardson's or respondent's was a matter of no consequence from any practical standpoint affecting carriage. In other words, so far as concerns substance, the duties to be performed under the second charter were no different nor no more burdensome than those requiring performance under the first charter, except that Port Natal is further away from Port Elizabeth than East London; but, to repeat, the ship had to go to Natal, anyway, on her outward trip, and to load at Port Natal was therefore not an extra burden.

It may be here noted that respondent on August 21, 1917, paid the freight as per the terms of the first charter, but at that time libelant knew nothing of what had occurred in South Africa. The position of libelant is that the second charter party was an instrument different from the first, that the voyage proceeded under the second charter, and that the terms of the second charter must therefore be complied with. Respondent contends that the first charter was outstanding, that it could not be rescinded nor done away with without consideration, and

that there was no consideration moving between the parties which would abrogate the first charter.

[1] It seems to me that the case may be disposed of on a theory somewhat different from those advanced by either side. The master and Wessinger undoubtedly had power to enter into a charter party as an independent or fresh transaction. On the facts in this case, however, they had no power to change the price agreed upon by their principals. There was a binding outstanding agreement that a voyage, in substance the same as that provided in the second charter, should be undertaken for $40,000. There was no general authority vested either in the master or in Wessinger to change the terms of the outstanding written instrument which constituted the first charter party. A master may not change the terms of a charter party, nor may an agent change the terms of a contract made by his principal, without specific authority so to do.

[2] The second charter cannot be regarded as a new charter, but as an attempted modification of an existing charter, which had not been rescinded nor otherwise abrogated. The general powers, therefore, of either master or agent, are arrested, where it is sought to exercise the powers of the principal, by changing the terms of an agreement theretofore made by the principal. The minds of the principals had met in respect of the charter price and other details, and they alone could change the agreement, unless specific authority were conferred upon their agents. The general powers which the master and the agent had were to deal with an unchartered ship, not to change an existing contract between their principals.

If the second charter party had not been made, surely respondent would have been liable, had it breached the first, and, as the second charter party must be regarded as nonexistent, the ship would have had recourse for its remedies under the first charter party, if on the voyage in question the respondent had breached any of the covenants, such as, for instance, the payment of port charges, lighterage, etc. In other words, the first charter party would have governed all the details, and protected owner and charterer in accordance with their intent and agreement. To put the matter the other way around, could respondent have held the vessel liable, if with the first charter party outstanding between the same parties the master by a new charter party had agreed to go to Brazil with a cargo of explosives (excepted under the first charter party), and the owner had then refused to permit such a charter party to be carried out?

Libel dismissed, with costs.